## Case No. 13,191.
### The SOUTHWEST.
### The L. P. SMITH.

[2 Flip. 79; 9 Chi. Leg. News. 385; 16 Alb. Law J. 167.] [1]

District Court. N. D. Ohio.  Aug., 1877.

COLLISION—TOWING—LIABILITY IN CASE OF COLLISION.

If a vessel employ a tug in general terms to tow in and land her at a particular place, the undertaking of the tug necessarily is that it will use the proper skill and ability to perform the service; and it has the right, and it becomes its duty as well, to direct the vessel that is towed, and to manage the helm, to the end that such vessel may aid in accomplishing the task entered upon, viz., making the landing.

In admiralty.

Willey, Terrell & Sherman, for libellants.
C. L. Fish, for defendant tug.
Grannis & Burton, for defendant schooner.

WELKER, District Judge. This is a libel filed by the owners of the schooner Young America. It states that the schooner Young

1 [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 16 Alb. Law J. 167, contains only a partial report.]

America was lying at Swain's wharf in the Cuyahoga river, and that the tug L. P. Smith had the schooner Southwest in tow, for the purpose of landing her at said wharf alongside of the Young America, and that in landing the schooner Southwest alongside of the Young America, the latter was injured by the collision.

The question raised in the evidence and on the trial is, whether the schooner Southwest, or the tug, is to be held liable for the injury sustained by the Young America. The libel was filed by the owners of the Young America against both of these vessels, and the controversy arises between the tug and the Southwest as to which was at fault, and occasioned the collision by which the damage resulted.

This tug was employed, as the evidence shows, for the purpose of towing into the Cuyahoga river and landing at the wharf, the Southwest. There is no evidence showing that any special arrangement was made as to how the Southwest should be landed. In every enterprise like this, the towing of a schooner from the lake into the harbor, there must be some one of the parties that will be in command, and held responsible for the proper execution of the duty.

The duty to be performed by the tug was to bring in from the lake the schooner Southwest, and land her at the place designated. It is claimed by counsel for the tug that the Southwest was at fault; that she had, to a great extent, the control of the operations of the tug; and it is claimed by counsel for the Southwest that the tug was in command of the expedition, and that the Southwest was under the orders of the tug, and if the tug gave orders that were improper, or orders that were obeyed by the schooner and injury resulted thereby, it was the fault of the tug.

Experts were called, during the trial of the case, for the purpose of enabling the court to ascertain the rule governing this class of crafts in the performance of such duties, and what seemed exceedingly curious, some stated that the tug was the commander of the expedition, and as many stated that the schooner was the commander of the expedition, and it is therefore very difficult to determine the rule from their testimony.

It is conceded on all hands that both of these vessels could not have been in command, because, if the captain of the schooner had the right to his sail, and the captain of the tug had the right to his sail, they might not have agreed in the mode and manner in which, or when, the vessel was to be landed. Some one must have the right to direct and control. I presume that might be regulated by contract; but I am clearly of the opinion that where there is a general employment by a vessel of a tug to tow her in, and land her at the particular place designated, that the tug necessarily undertakes to bring with it the necessary skill and ability to perform that

service, and that it has the right, and is its duty to direct the schooner in the management of her helm, so that she may aid in making the landing sought to be accomplished. For it will be borne in mind, that a schooner coming into the mouth of the Cuyahoga river, is an entirely helpless thing, excepting the operation she may perform with her rudder, which more or less controls her movements, and she has no motive power, except that which she receives from the tug. But the question is who had the control and direction of the rudder in making that landing?

It is alleged on behalf of the schooner, that she was ordered at a certain place in the river to starboard her wheel, in order to allow the tug to back alongside and fasten on to her, to more easily accomplish the landing; and it is alleged on behalf of the tug, that immediately after the Southwest had starboarded her wheel, and the tug had got alongside of her, the order was given by the captain of the tug to the Southwest, to port her wheel in order to aid in getting at the proper place to land, and that the order was disobeyed. But it is alleged by the schooner that her wheel was ported as directed. If it were true, and sustained by the evidence—the tug having the right to give the order—that the captain of the schooner did not obey the order to port (and the witnesses all said it was necessary to port the wheel at that situation of affairs in the river) and an injury resulted therefrom, then it would not be the fault of the tug. That is a matter of evidence that must be determined from the witnesses examined on the trial of the case. The testimony was somewhat contradictory on that subject; but applying the rules to the testimony that courts apply in the trial of cases, as to the knowledge of the parties that testified, it strikes me that there can be but little doubt that the captain of the schooner Southwest obeyed the order and did port his wheel. He knows all about it, his wheelsman knows all about it, and another party that was on the vessel, knows whether it was ported or not. It is a fact within their observation and knowledge rather than that of outsiders. It is true, that the captain of the tug testified, that he saw the captain of the schooner go to the wheel, at or nearly at the point of the collision, and put his wheel at port. The captain of the schooner denies that, and says that he went there for the purpose of seeing whether it was all right, and he found it was all right. That would hardly be enough to discredit the express and positive statement of the captain of the Southwest, of the fact that the wheel was put at port immediately after receiving the orders. If the wheel of the schooner was put at port as directed, then what else could she do? She was entirely under the control of the tug in her maneuvers for the purpose of landing. It is conceded by all the parties that if the tug had backed within a certain distance of the wharf, after she had fastened upon the vessel, that she

could have been sheered so as to have avoided the collision.

The testimony on behalf of the Southwest is pretty strong to show that the tug did not back at all, and the witnesses on behalf of the tug, who were present and of course knew all that occurred, swore that they commenced to back as soon as they had made fast, and that because the helm was at starboard, and not at port, the tug did not get control of the vessel, so as to avoid the collision. I am inclined to think that the evidence justifies me in saying, that the tug did back, but the difficulty about it is, it did not begin to back soon enough.

There is nothing in which witnesses can be easier mistaken than in time and distances on water. From the locality these vessels were in, there was not much space, and there was not much time to lose, in the backing operation in order to avoid the collision. At exactly what point the tug began to back and what effect it had, is a question about which witnesses might very easily be mistaken and might differ very materially.

It was the duty of the tug to back in time to avoid the collision, and the testimony of all the witnesses in relation to that matter is, that if the tug had commenced to back after the wheel was put at port, within a certain distance of the wharf, the collision could have been avoided. The tug having control of the motive power of the vessel, whether pulling the vessel along at a good speed or at a slow speed, is a matter that the tug must control in order to accomplish the landing at a certain place; and if the tug came up too fast, so that they could not land at the proper place without injury to the vessel, it was the fault of the tug.

In viewing this case in the whole, I am very well satisfied that the schooner did nothing that was faulty in her operations, and that the collision, happening as it did, must necessarily have happened by reason of the fault of the tug; and it seems to me that the outside evidence is very satisfactory to show that the tug did not manage the vessel as she ought to have managed her to avoid the collision.

The decree will therefore be against the tug, releasing the schooner Southwest.